# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. SCOTT LANE BROWN,<br>2. LAURIE ANN BROWN,<br><br>   Plaintiffs,<br><br>v.<br><br>1. CSAA FIRE & CASUALTY INSURANCE<br>   COMPANY, a foreign for profit Insurance<br>   Corporation,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)Case No.:18-cv-60-GKF-FHM<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## RULE 26 EXPERT REPORT OF SEAN C. PETRONZI

1.    I was originally hired by CSAA in 1990 in the capacity of Property and Bodily Injury Adjuster. I was a CSAA employee for approximately 3-4 years. I was re-hired by CSAA in January 2011 as a Homeowners Adjuster in the Las Vegas Regional Center. I was promoted to National Catastrophe Team Lead in August of 2011. I worked for CSAA in this capacity until May of 2015.

2.    As a National Catastrophe Team Lead my responsibilities included the supervision of all inside catastrophe adjusters for CSAA nationwide, including CSAA staff and contract adjusters operating in the State of Oklahoma. I was one of five National Catastrophe Team Leads responsible for approving all loss payments made to first-party insureds, as well as all outgoing denials. I was also charged with the responsibility of reviewing coverage questions brought to me by adjusters, supervisors, team leads, and upper management. Additionally, I was responsible for drafting responses to complaints filed against CSAA with various state departments of insurance. On numerous occasions I was selected by CSAA to act as its corporate representative in litigation under Rule 30(b)(6). Additionally, during my career with CSAA I was selected by CSAA's litigation department to review homeowners and catastrophe claims that were involved in pending

1

litigation. In those instances, I was tasked with reviewing the claim decisions made by CSAA in those underlying claims and determining whether they were handled appropriately under the terms and conditions of the policy. If I determined that these litigation claims were not paid according to the policy terms, it was my responsibility to issue payment for the amount that was owed, plus interest and attorney fees. While I was a CAT Team Lead, my duties and responsibilities included making coverage determinations and approving payments and denials where appropriate, on roofing damage claims similar or essentially identical to the Browns' claim in this case.

3.   I was contacted by Mr. McGrew in the Summer of 2018 regarding the Brown claim. I have been asked to provide expert opinions regarding claims handling, insurance industry standards, good faith claim handling practices, and CSAA's handling/adjustment of the Brown's insurance claim. My hourly rate for consulting work is $150.00/hour. In the past 4 years, I have given depositions in the following cases: Stover v. State Farm – Oklahoma Western District; Walker v. USAA - Oklahoma Western District. In doing so, I approached this claim as I would have in my capacity as CSAA National Catastrophe Team Lead. I have reviewed and relied upon the claim file in its entirety, as well as all documents produced/exchanged in the litigation process. Additionally, I have reviewed and relied upon the following documents and information in the formulation of my opinions:

- Deposition of Scott Brown
- Deposition of Laurie Brown
- Deposition of Tyrone Haynes
- Deposition of Brooks LaBrue
- Cole House Affidavit
- Engineering Report of Kelly Parker, PE
- Plaintiffs' Initial Disclosures
- Subpoena Documents Received from 470 Claims
- Subpoena Documents Received from Hancock Claims Consulting
- CSAA's Claim File
- Prior Claim File (CSAA_BROWN 1358-1416)
- Complaint, Answer, and All Discovery Responses

2

- Certified Copy of the Insurance Policy

4.  As stated above, I have reviewed the Brown claim in order to assess whether or not CSAA's handling of the claim was consistent with insurance industry norms and good faith claim handling practices. Having reviewed all of the information and after applying my background, knowledge, training, and experience, my opinion is that CSAA's investigation, evaluation, and denial of the Browns' claim was not consistent with insurance industry norms, good faith claim handling practices and principles, or the terms and conditions of the insurance policy.

5.  CSAA conducted an unreasonable investigation of the Browns' claim, and evaluated the results of that investigation unreasonably. The Browns' home was hit by a hail storm on May 11th, 2017. (See Proof of Loss; 8/7/2017 Loss Report; Smart House Consultants Report). The Browns were not home at the time of the storm, but became aware of it by talking with their neighbors. Shortly after, the Browns noticed roofs being replaced in the neighborhood and thought that they should get their roof checked for hail damage caused by the recent storm. (See Deposition of Scott Brown, Page 16).

The Browns contacted Oklahoma Home Design, a local roofing company recommended by Mrs. Brown's father. Paul White, a roofing contractor with Oklahoma Home Design, came out and inspected the Browns' roof. Mr. White advised the Browns that their roof had extensive hail damage, and that it needed full replacement. (See Deposition of Scott Brown, Page 16). The Browns submitted a claim to CSAA on July 28, 2017. (See Claim Notes - First Notice of Loss dated July 28, 2017).

CSAA assigned the claim to independent field adjuster Cole House. Mr. House inspected the Browns' home on 8/1/2017. (See Claim Notes, Loss Report, and Affidavit of Cole House). During his inspection, Mr. House confirmed and documented hail damages to the Browns' roof, gutters, downspouts, window screens, and window beading and confirmed May 11th. 2017 as the date of loss[1]. Mr. House inspected and took test squares on all directional slopes. He

---

[1] The May 11th. 2017 date of loss is verified by Mr. House's inspection findings, Mr. Parker's report and weather data, as well as CSAA's previous claim file (CSAA_BROWN 1358-1416). My review of this prior claim file indicates that no storm damage was present to the Browns' roof, gutters, or downspouts in 2015. It is clear that the damages occurred after CSAA's 2015 inspection, on May 11th. 2017.

3

documented substantial hail damages in those test square up to "20+ hail hits in half of a 10ft x10ft test square." Mr. House also found that "some of the hail hits on all directional slopes had completely penetrated the mat of the shingle." (Affidavit of Cole House). Mr. House's findings were also verified by Kelly Parker, PE, who subsequently inspected the Browns' home. (See Smart House Report). Accordingly, Mr. House told the insured that the roof was totaled by hail and needed full replacement. (See Deposition of Scott Brown, Page 27). He generated an estimate accordingly, in the amount of $23,901.96, and submitted it, along with his photographs and loss report to CSAA. (See Claim Notes and Loss Report).

I reviewed the findings documented and submitted to CSAA by Mr. House the same way as I would have when I was a National Catastrophe Team Lead with CSAA. I am very familiar with the role of inside adjuster and the duties, responsibilities, insurance norms, and fair claims handling practices that a desk adjuster must follow. First and foremost, it is important to understand that the field adjuster is the person who acts as the inside adjuster's "eyes and ears" on the claim. My review of the file shows that Mr. House is the only licensed insurance adjuster who climbed on and inspected the Browns' roof[2]. The field adjuster's role is to inspect the loss, gather the facts and evidence, and provide a recommendation based on the results of that investigation. The inside adjuster's role is to evaluate those findings and apply coverage **based upon the findings made by the field adjuster**. It is not customary in the claims industry, nor is it appropriate, for an inside adjuster to arbitrarily disagree with or change that factual findings made by the field adjuster. Instead, the inside adjuster should apply the policy terms to those findings and issue payment to the insured accordingly. After all, a field adjuster who personally inspected the loss is the person best situated to provide an opinion as to the facts of the loss and the damages observed.

Here, Mr. House, a licensed adjuster and CSAA's eyes and ears on the ground, documented that the Browns' home was hit by a hail storm on May 11th. 2017 and that this hail storm caused extensive damages to their composition roof, gutters, downspouts, window screens, and window beading. Mr. House documented and reported that, based upon his inspection, the Browns' roof was a total loss caused

---

[2] As discussed at greater length below, Mrs. Miller never inspected the Browns' roof.

4

by hail which occurred within the policy period. Mr. House's photographs and loss report support his findings. The evidence gathered in the field clearly demonstrates that the Browns suffered a hail loss within the policy period. While Mr. House (and Mr. Parker) have both documented hail impacts which have penetrated the mat of the shingle, it is important to note that the policy language does not require this extent of damage. The policy covers "direct physical loss" and does not require full penetration of the mat to be considered damage. (See Policy Section I Perils Insured Against, Page 21). In my experience, hail strikes to shingles damage and displace the granular coating, which is direct physical loss, irrespective of whether the impact penetrated the shingle mat. Regardless, the findings in the Brown claim clearly demonstrated extensive hail damage to all directional slopes of the roof, as well as the soft metal components, gutters, downspouts, etc.

Additionally, I have reviewed the estimate generated by Mr. House and it seems to be appropriate and in line with the damages documented in the field. Accordingly, if I were the desk adjuster tasked with applying coverage to these findings, I would have issued a payment to the Browns in the amount of $23,901.96, less a deduction for depreciation and policy deductible. Indeed, this is the only appropriate conclusion that can be drawn from the facts gathered in the field. If CSAA had questions about Mr. House's findings, the inside adjuster should have called Mr. House to ask those questions. I can find no documentation that CSAA did so.

Instead, CSAA rejected Mr. House's estimate and findings, and instructed him to perform a re-inspection and complete a "full roof inspection." (Claim Notes- Page 31-32). Mr. House refused to do so, because he had "already seen and documented the obvious hail damage and given AAA plenty of information to evaluate the claim." (Affidavit of Cole House). Clearly, Mr. House did complete a full roof inspection, including test squares on all directional slopes. (See Loss Report and Affidavit). Further, it is undisputed in this case that Mr. House's roof inspection complied with CSAA's own inspection and estimating guidelines which require a minimum of 8 hail hits per square when considering replacement:

**Q. How many hits per square did Mr. House find on the front slope of the Browns' home? I'll direct you to Exhibit 2, Page 2.**

5

A. Based on his notes here, 20 hits.

Q. He found 20 hits in half of a ten-by-ten test square, correct?

A. Based on his notes, yes.

Q. So if you were to extrapolate that out, he found 40 hits in a ten-by-ten test square on the front slope, fair?

A. Fair.

Q. How many hits did Mr. House find on the right slope --

A. Fifteen.

Q. -- test square of the Browns' roof?

A. Fifteen.

Q. Fifteen in a half a test square, so he found 30 in a full ten-by-ten, correct?

A. Correct.

Q. How about for the rear slope test square?

A. Twenty.

Q. Twenty in a half a test square equals 40 in a ten-by-ten test square, correct?

A. Correct.

Q. How about the left slope?

A. Eighteen.

Q. And again, 18 he found in only half of a ten-by-ten test square, how many would that mean for a full ten-by-ten test square?

A. Thirty-six.

......

6

**Q. But you would agree that if Mr. House got on the roof from the valleys like he said he did, his inspection comported with AAA's own guidelines regarding roof inspection, correct?**

**A. Correct.**

(Tyrone Haynes Deposition, Page 120-125).

Inexplicably, Mr. Haynes, the inside adjuster who ultimately denied the Browns' claim, did not remember if he ever reviewed or considered Mr. House's loss report documenting these damages. (Tyrone Haynes Deposition, Page 50).

Further, Mr. Haynes never provided Mr. House's $23, 901.96 replacement cost estimate to the Browns, even though he testified that good faith claim handling principles require him to provide all evidence which supports coverage to a first party insured:

**Q. You recognize Exhibit 8 to be the estimate that Mr. House generated after his inspection of the Browns' home, correct?**

**A. Yes.**

**Q. Turning to the summary page on Page 5, you can see that the replacement cost value of this estimate is $23,901.96, correct?**

**A. Yes.**

**Q. Turning to the first page of the estimate, at the bottom it says, "The following estimate represents a fair and reasonable figure to repair or replace the damaged items or structures noted at the time of my inspection." Did I read that correctly?**

**A. Yes.**

**Q. This estimate was never provided to Mr. and Mrs. Brown, was it?**

**A. No.**

.....

7

**Q. You testified earlier that good faith requires you to provide information to an insured that supports either coverage or denial of a claim, correct?**

**A. Correct.**

**Q. This estimate supports coverage, doesn't it?**

**A. The estimate is an estimate for damages, yes.**

**Q. And because it's an estimate for hail damages, it supports coverage, correct?**

**A. The estimate was never approved.**

**Q. Listen to the question I asked you.**

**COURT REPORTER: "And because it's an estimate for hail damages, it supports coverage, correct?"**

**MR. PIGNATO: And I objected to the form.**

**A. Yes.**

(Tyrone Haynes Deposition, Page 80-81).

My review of the .esx file (Xactimate file format) documents produced in this case and the deposition testimony shows that Mr. House's replacement cost estimate was reduced from $23,901.96 to $0.00 (after deductible) unbeknownst to the insureds. CSAA's denial letter states that CSAA's estimate of damages "is less than [the Browns'] $2,000.00 deductible. (See Denial Letter dated August 24, 2017). However, the .esx file shows that CSAA's estimate was $23,901.96, but that CSAA essentially erased the findings of its field adjuster and brought the Browns' estimate down from $23,901.96 to $0.00. (Tyrone Haynes Deposition, Page 85-87). This makes the denial misleading and factually inaccurate.

6.     Instead of issuing payment to the Browns for $23,901.96, less a deduction for depreciation and policy deductible per insurance industry norms and good faith claim handling practices, CSAA rejected Mr. House's findings and ordered another inspection. Present at this inspection were CSAA's independent adjuster Susan Miller, Anthony Peralta with Hancock Claims Consulting, Mrs. Brown, and Paul

8

White with Oklahoma Home Design. It is undisputed that CSAA's adjuster Susan Miller never got on the roof (Laurie Brown Deposition, Page 25; Anthony Peralta Deposition, Pages 38, 71, 106). Mr. Peralta, the Hancock inspector, spent only 20 minutes on the roof. (Anthony Peralta Deposition, Page 65). Mr. White, the insureds contractor got on the roof and pointed out the hail damages to Mr. Peralta. (Anthony Peralta Deposition, Page 64). However, Mr. Peralta concluded that the Browns' roof had no hail damage. (See Hancock Roof Inspection Form). Based on my previous expert consulting work, I believe that Hancock Claims Consulting is doing biased work in favor of insurance carriers in the State of Oklahoma – intentionally finding no damage, or attributing covered storm damages to an excluded cause of loss which they know will result in findings of no coverage.

Based on Hancock's findings, CSAA reduced its estimate to $1,862.71 on a replacement cost basis. This reduced estimate ignores the covered hail damages confirmed and documented by CSAA's own adjuster during the first inspection. Additionally, while this estimate included a portion of gutters and downspouts, it offsets the replacement cost of those items by the salvage value of the aluminum. (See CSAA's Second Estimate, Line Item 8 – See Notation "No debris removal allowed as the salvage value of the aluminum in the gutters and downspouts will offset the debris haul off and dump fees.").

It is important to understand that items within an estimate are composed of multiple components necessary to complete the work estimated: material cost, labor cost, debris removal, etc. Here, CSAA has removed debris removal costs from these items on the basis of aluminum salvage value, essentially offsetting the claim payment by the salvage value of these damaged, aluminum gutters/downspouts. This is not consistent with insurance industry standards, norms or appropriate claim handling practices. A first party carrier cannot force it's insured by become a salvager. CSAA has the right to retain damaged building components, such as aluminum gutters, and sell them for whatever salvage value they may have. However, they cannot offset owed policy benefits by this perceived salvage value, thereby forcing an insured to salvage damaged building components in order to be made whole. Additionally, CSAA's own investigation in this claim determined that the Browns' damaged property has no salvage value at all. (See Loss Report dated 8/7/17 – "No salvage possibilities exist as the damaged property appears to have no value."; See also, Claim Note Loss Details, Page 16).

9

Essentially, CSAA acted outside of insurance industry norms and violated generally accepted first-party fair claims practices by offsetting undisputed claim payments by the salvage value of the Browns' aluminum gutters/downspouts, even though CSAA's own investigation revealed that these items had no salvage value. It is undisputed that doing so violates appropriate claim handling principles:

**Q. Sure. Like if the insured had a hailstorm and their gutters and downspouts were damaged by the hail and the insurance company's investigation showed that the gutters and downspouts have no salvage value, but the insurance company, nonetheless, offset the claim payment by salvage value of those gutters and downspouts, that wouldn't be consistent with good faith claims handling, would it?**

A. True.

Q. (By Mr. McGrew) I'm going to turn you to the claim notes, Page 16. Under categorization it says, "Is there salvage potential on this loss." Would you read what AAA wrote in their claim notes about is there salvage potential on this loss?

A. "No."

Q. And you agree with that, there's no salvage potential on the Browns' claim, correct?

A. Correct.

Q. Would you flip to Exhibit 2, which is Mr. House's loss report. Under salvage, it says, "No salvage possibilities exist as the damaged property appears to have no value." Do you agree with that statement?

A. That's what he wrote, yes.

Q. So if AAA deducted the -- a salvage value from property that doesn't have any salvage value, that wouldn't be good faith claims handling, would it?

A. True.

(Tyrone Haynes Deposition, Page 76-77).

10

Mr. Haynes went on to admit that CSAA did just that in the Browns' claim:

**A "No debris removal allowed as the salvage value of the aluminum in the gutters and downspouts will offset the debris haul off and dump fees."**

**Q. It appears to you reading this that whoever generated this estimate offset the amount of debris removal against the salvage value of these aluminum gutters and downspouts; isn't that true?**

**A. True.**

....

**Q. It appears, looking at this estimate, that they offset the salvage value of the aluminum against the value of the claim; isn't that true?**

**A. True.**

**Q. That's not consistent with good faith and fair dealing, is it?**

**A. True.**

(Tyrone Haynes Deposition, Pages 88, 90).

7.   CSAA's revised $1,862.71 was beneath the Browns' deductible, resulting in no payment being issued to them for this covered loss. However, CSAA's denial letter states that ""AAA has provided you with sufficient information to put you on notice of the need to undertake necessary repairs to your property. While AAA unfortunately cannot agree to extend coverage for the cost of repairing the problem due to the language of the insurance policy, AAA nevertheless expects that you will undertake all necessary repairs as to protect the property from further damage. Should you elect not to undertake the recommended repairs, AAA cannot be held liable for any further damage to the dwelling or other structures insured by AAA." This language is not consistent with insurance industry norms and fair claim handling standards. Essentially, CSAA is telling the Browns that: they need to replace their roof, which CSAA's own adjuster acknowledged was damaged by hail that occurred during the policy period; CSAA will not pay for the damages; and that CSAA nonetheless expects these repairs to be made. This failure to

11

properly adjust the claim leaves the Browns in a situation where they are forced to undertake necessary repairs to their property without the benefit of the policy coverages for which they have paid premiums. The Browns did replace their roof without any insurance benefits, by refinancing their home. (Deposition of Scott Brown, Pages 5, 6, 7, 58, 59). I believe that CSAA's claim handling and adjustment of this claim did not comport with insurance industry norms and fair claims handling practices and, as a result, left the Browns forced to incur costs to repair covered damages which were documented by CSAA's own adjuster, but not properly considered and adjusted by CSAA.

I declare under penalty of perjury, under the laws of the State of Nevada, that the foregoing is true and correct.

Executed this 9th day of January, 2019.

                                            Sean C. Petronzi
                                            _____
                                            SEAN C. PETRONZI

# Sean C. Petronzi

11345 Asilo Bianco Dr.
Las Vegas, NV 89138
(702) 240-8631 (home)
(775) 233-3333 (cellular)
E-mail: sean@summitsettlements.com

**EDUCATION**   *Bachelor of Arts in Criminal Justice*
University of Nevada, Reno; 1990

Licensed Property, Casualty and Life Broker/Agent in Nevada and multiple other reciprocal states, including Texas and Oklahoma.

President – Northern Nevada Claims Association 1996-1997
Treasurer – Northern Nevada Claims Association 1995-1996

**EXPERIENCE**   **National Catastrophe Team Lead**
California State Automobile Association
Las Vegas Regional Claim Center
January 2010 – May 2015
- Managed "pods" of 12-25 inside independent adjusters responsible for handling all incoming estimates from the field and settling with the Insureds. Handled all claims settlement approvals up to $50,000.00.
- Responsible for all internal claims count reporting and reporting of all PCS declared catastrophes to the business analytics and claim departments. CA CEA Earthquake certified.
- Handled all Department of Insurance Complaint responses for the homeowners liability and catastrophe team. Attended all bad faith depositions, as well as being deposed as the AAA corporate representative for all 30(6)b depositions.

**Settlement Consultant**
Summit Structured Settlements
July 2006 – January 2010
- Attended mediations and settlement conferences involving plaintiff and defense attorneys and work closely with claims adjusters from various large insurance carriers. Perform claim value and reserve evaluations for adjusters and assist with determining claim settlement values.
- Managed and directly oversaw a staff of 3-5 employees and assistants, including assignment of new cases and performing their job evaluations annually. Work closely with both defense and plaintiff attorneys assisting them in cases evaluations and potential settlement and trial verdict values.

**Senior Casualty Specialist**

California State Automobile Association
Las Vegas Regional Claim Center
November 2005 – July 2006
- Investigated and resolved high exposure auto accident cases which included vehicle damage appraisal and negotiating settlement of property damage and bodily injury claims with claimants directly or with their attorney.

**Senior Claims Representative**
St. Paul Fire and Marine Insurance Co.
February 1996 – June 2005
- Investigated and negotiated settlement of medical malpractice claims brought against St. Paul insured physicians and hospitals. Oversee the assignment of litigation cases to defense counsel and monitor their performance through resolution of claim.
- Handled professional medical liability and commercial general liability claims, as well as investigating excess coverage issues and cases involving potential fraud.
- Maintained one of the top three highest caseloads for the company in the thirteen states West Region.

**Independent Claims Adjuster**
R.L. Gresham & Company, Inc.
December 1994 – February 1996
- Investigated and negotiated liability claims for out-of-state insurers such as St. Paul Company, United Nations Group, Crum and Forster and Insurance Company of the West.
- Handled premise liability, property damage and auto damage claims for self insured entities which included casinos and large self-insured businesses.

**Legal Assistant**
Edward M. Bernstein and Associates
April 1992 – August 1994
- Managed and negotiated the settlement of personal injury claims prior to litigation. Supervised my secretary and front office staff.
- Dealt primarily with large insurers such as Farmers, State Farm, and Allstate on behalf of our clients.

**REFERENCES**   Excellent references available upon request.